**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WASHINGTON STATE NURSES
ASSOCIATION,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS
BOARD,

*Respondent.*

No. 06-74917

NRLB No.
19-CA-29150

OPINION

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
March 10, 2008—Seattle, Washington

Filed May 20, 2008

Before: Betty B. Fletcher, Richard A. Paez, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Paez

## COUNSEL

Timothy Sears, Washington State Nurses Association, Seattle, Washington, for the petitioner.

David A. Seid, National Labor Relations Board, Washington, D.C., for the respondent.

Michael B. Love, Paine Hamblen LLP, Spokane, Washington, for the amicus.

## OPINION

PAEZ, Circuit Judge:

Petitioner Washington State Nurses Association ("WSNA") seeks review of the National Labor Relations Board's ("NLRB" or "Board") decision that Sacred Heart Medical Center's ("Sacred Heart") ban on union buttons bearing the message "RNs Demand Safe Staffing," did not constitute an unfair labor practice in violation of the National Labor Relations Act ("NLRA" or "Act").[1] This case calls on us to reaf-

---

[1] We granted leave to Sacred Heart to file an amicus curiae brief in support of the Board's decision.

firm the cardinal principle of agency review: an agency's decision must be supported by substantial evidence in the record. Because the Board's decision here was not, we grant WSNA's petition and remand to the Board with directions to reinstate the Administrative Law Judge's ("ALJ") Decision and Order.

## I.  FACTS

Sacred Heart is an acute care hospital in Spokane, Washington; WSNA is a union that represents approximately 1200 registered nurses employed there. In the fall of 2003, WSNA and Sacred Heart began negotiations for a new collective bargaining agreement ("CBA") to replace the then-existing agreement, set to expire in January 2004. Negotiations continued past the agreement's expiration, well into 2004.

During the CBA negotiations that fall and winter, nurses at Sacred Heart wore a number of union buttons without incident. The buttons read: "Together Everyone Achieves More"; "WSNA SHMC RNs Remember 98"; "Staffing Crisis — Nursing Shortage — Medical Errors — Real Solutions"; and "RNs Demand Safe Staffing." *See Sacred Heart Med. Ctr. and Washington State Nurses Ass'n*, ___ N.L.R.B. ___, 347 NLRB No. 48, 2006 WL 1875747, at *1 (June 30, 2006). On February 27, 2004, Sacred Heart issued a memorandum banning the nurses from wearing the "RNs Demand Safe Staffing" buttons "in any areas on our campus where they may encounter patients or family members." *Id*. at *2.

The memorandum explained:

> We know that staff have worn a variety of buttons over the years for different purposes, and we have no objection to most messages. This message, however, disparages Sacred Heart by giving the impression that we do not have safe staffing. We cannot permit the wearing of these buttons, because patients and

> family members may fear that the Medical Center is not able to provide adequate care.
>
> It is difficult for us to understand why nurses would wear these pins at the risk of upsetting their patients, particularly since we have come to agreement with [the Union] at the bargaining table on issues related to staffing and how staff will be involved when staffing issues arise.
>
> To assure that patients do not become alarmed or fearful about patient care at Sacred Heart, effective immediately, it is our expectation that no staff member will wear these buttons in any area on our campus where they may encounter patients or family members.

*Id.* at *1-*2.

After the hospital issued the ban, several nurses were told to remove their buttons; no nurse was disciplined for wearing the button. *Id.* at *2.

On March 2, 2004, WSNA filed an unfair labor practice charge with the NLRB. An ALJ conducted an evidentiary hearing, and on March 24, 2005, issued a decision concluding that Sacred Heart engaged in an unfair labor practice under Section 8(a)(1) by "promulgating, maintaining, and enforcing" the button prohibition. *Id.* at *13. In a June 30, 2006 decision and order, a divided three-member panel of the Board (with member Liebman dissenting) reversed, finding that although the button prohibition was presumptively invalid because it extended beyond immediate patient care areas, it was justified by "special circumstances" because Sacred Heart had demonstrated that the button's message would disturb patients. *Id.* at *1. On October 10, 2006, WSNA timely filed a petition for review of the Board's decision and order.

## II.  ANALYSIS

### A.  Standard of Review

We may overturn the Board's findings of fact only when they are not supported by substantial evidence in the record, or the Board has not correctly applied the law. *Cal. Pac. Med. Ctr. v. NLRB*, 87 F.3d 304, 307 (9th Cir. 1996). " '[T]he substantial evidence test requires a case-by-case analysis and a review of the whole record,' and requires a reviewing court to 'take into account whatever in the record fairly detracts' from the Board's conclusions." *Healthcare Employees Union v. NLRB*, 463 F.3d 909, 918 (9th Cir. 2006) (internal citations omitted). Findings that are not supported by "substantial evidence on the record considered as a whole," must be set aside. *NLRB v. Baptist Hosp.*, 442 U.S. 773, 782 (1979) (quoting 29 U.S.C. § 160(e)). We defer to the Board's interpretation of the NLRA where that interpretation is "reasonably defensible." *Cal. Pac. Med. Ctr.*, 87 F.3d at 307.

### B.  Unfair Labor Practice

**[1]** Section 8(a)(1) of the National Labor Relations Act makes it "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7 of the Act]." 29 U.S.C. § 158(a)(1). Section 7, in turn, provides that employees have "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

**[2]** The Board has long recognized that under Section 7, union members have a protected right to wear union insignia in the workplace. *London Mem'l Hosp.*, 238 N.L.R.B. 704, 708 (1978); *see also Republic Aviation Corp. v. NLRB*, 324 U.S. 793 (1945); *Pay'n Save Corp. v. NLRB*, 641 F.2d 697,

700 (9th Cir. 1981). In the healthcare context, restrictions on the wearing of union insignia in "immediate patient care" areas are presumptively valid; by contrast, restrictions on union insignia in other areas of a hospital are presumptively invalid. *Casa San Miguel*, 320 N.L.R.B. 534, 540 (1995); *Mesa Vista Hosp.*, 280 N.L.R.B. 298, 299 (1986). An employer may rebut the presumption of invalidity by showing that "special circumstances" justify the restriction. Special circumstances exist where the restriction is "necessary to avoid disruption of health-care operations or disturbance of patients." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 507 (1978); *see also NLRB v. Los Angeles New Hosp.*, 640 F.2d 1017, 1020 (9th Cir. 1981). The employer bears the burden of proving an adverse impact on patient care. *Baptist Hosp.*, 442 U.S. at 781; *Mesa Vista Hosp.*, 280 N.L.R.B. at 298-99.

[3] The Board's determination that special circumstances justified Sacred Heart's "RNs Demand Safe Staffing" button ban is not supported by substantial evidence in the record. In fact, it is not supported by any evidence. The record reveals that the buttons were worn for several months without incident. Sacred Heart claims that the button's message would disturb patients. That assertion is speculative at best. Moreover, Sacred Heart's speculative concern is contradicted by actual evidence in the record that there was never any disturbance involving the button. There is no evidence in the record that supports the Board's special circumstances finding.

Sacred Heart hangs its hat on an "offer of proof" that it presented during the hearing:

> [I]f called as a witness, the vice president of human resources, Diana Eickhoff would testify that hospital administration was approached by certain nurse managers expressing their concern as to the impact of the demand safe staffing button on patients and their families; and thereby inquired as to how to respond.

The ALJ accepted the offer of proof, contingent on the parties' rights to later brief the relevance and weight that should be accorded to it. On the basis of the offer of proof, the ALJ made the following finding: "The parties also agreed that Respondent's human resources personnel were approached by certain nurse managers expressing their concern as to the impact of the 'Safe Staffing' button on patients and their families." *Sacred Heart Med. Ctr.*, 2006 WL 1875747, at *11.[2] The ALJ further found that the offer of proof did not amount to evidence that "any of Respondent's patients were actually disturbed." *Id.* at *12.

In reversing the ALJ's decision, the Board explained that an employer need not show actual disturbance of patients before prohibiting union activities. *Id.* at *3. The Board concluded that the button's "inherently disturb[ing]" message was enough to support a special circumstances finding. The Board also pointed to the offer of proof, establishing that nurse supervisors "expressed concern over the impact the button may have on patients." *Id.*

The Board's approach was contrary to its established precedent, to our sister circuit's precedent, and to the basic adjudicatory principle that conjecture is no substitute for evidence.

*Mt. Clemens General Hospital v. NLRB*, 328 F.3d 837 (6th Cir. 2003), is on point and persuasive. In that case, the nurses union and the Hospital were engaged in a dispute over "staffing levels at the Hospital. The RN's [sic] assert[ed] that not enough full-time nurses [were] hired which force[d] incumbent staff to work inordinate amounts of forced overtime." *Mt. Clemens Gen. Hosp.*, 335 N.L.R.B. 48, 49 (2001). The union distributed buttons reading "FOT" with a line drawn

---

[2]The ALJ may have overstated the parties' positions, in that the parties did not stipulate to the factual basis of the offer of proof. Neither party, however, has disputed the ALJ's characterization of that evidence before the Board or this court.

through the letters, which was meant as a "silent protest of 'no forced overtime.' " *Id.* The Hospital ordered the nurses not to wear these buttons anywhere in the Hospital, including non-patient care areas. *Mt. Clemens Gen. Hosp.*, 328 F.3d at 847. The Hospital argued that special circumstances justified the ban, because the buttons would lead patients to "be concerned about the quality of care at the Hospital." *Id.*

**[4]** Both the Board and the Sixth Circuit rejected the Hospital's argument because "[t]he Hospital's efforts to justify [the] ban . . . depend[ed] primarily on speculation about the possible effect of the buttons." *Id.* To meet its burden, the Hospital was required to "produc[e] evidence pertaining to each non-patient care area affected by the [ban]" that established "either that the buttons cause problems or that they were more likely to cause problems than any other Union buttons worn by RNs at the Hospital." *Id.* According to the Sixth Circuit, the testimony of two doctors and an administrator that the buttons might cause concern among patients did not constitute substantial evidence of special circumstances justifying a Hospital-wide ban on the buttons.[3]

---

[3]In its opinion on review, the Board methodically listed the types of evidence that could have established special circumstances—all missing from the record in *Mt. Clemens*, as well as from the record in this case:

> [The testifying administrator] did not know of any complaints from patients or their families that the wearing of the FOT button was disruptive or caused a dialogue to take place with the RN's [sic]. Moreover, [he] admitted that no hospital administrator made an official report that the wearing of the FOT button caused any disruption or interfered with patient care or safety . . . . [Another administrator] admitted that the wearing of the FOT button did not cause a work stoppage or sit-down strike and she did not have any evidence that the RN's [sic] discussed the FOT button with patients. Likewise, she acknowledged that the Respondent did not conduct a survey or make any inquiries of patients or their families that the wearing of the FOT button interfered with patient care or safety.

*Mt. Clemens Gen. Hosp.*, 335 N.L.R.B. at 50-51

The Board's attempt to distinguish *Mt. Clemens* from the instant case is unavailing. In its decision, the Board explained that the "RNs Demand Safe Staffing" button conveys a drastically different message than the button in *Mt. Clemens*. In fact, the messages conveyed by the buttons are almost identical—they advocate for adequate staffing levels. We agree with dissenting member Liebman's observation that "[w]hether a button protests 'forced overtime' or demands 'safe staffing,' both messages obviously relate to the impact of inadequate staffing levels on the hours RN's [sic] are required to work and the conditions they labor under." *Sacred Heart Med. Ctr.*, 2006 WL 1875747, at *8 (Liebman, dissenting) ("Anyone viewing the 'RNs Demand Safe Staffing' button, which bears the union's insignia, would likely identify it for what it really is: a garden-variety union button, with a slogan related to staffing concerns, worn by RNs during the course of labor negotiations with management over the terms and conditions of their employment."). Consistent with this view, both the courts and the Board have long recognized that nurses' working conditions are directly related to patient care and safety. Indeed, in *Beth Israel*, the seminal healthcare-sector labor case, the Supreme Court focused its analysis of the National Labor Relations Act in hospital settings on the close correlation between hospital working conditions and patient safety. *Beth Israel Hosp.*, 437 U.S. at 497-98 ("Congress determined that the extension of organizational and collective-bargaining rights would ameliorate [poor healthcare-industry working] conditions and elevate the standard of patient care."); *see also Misericordia Hosp. Med. Ctr. v. NLRB*, 623 F.2d 808, 813 (2d Cir. 1980) (noting the relationship between hospital staffing levels, nurses' working conditions, and patient care); *Waters of Orchard Park*, 341 N.L.R.B. 642, 644 (2004) (acknowledging that "nurses' concerns—staffing levels and the number of patients to be cared for—[are] directly related to . . . nurses' working conditions").

*Mt. Clemens* simply reaffirms the uncontroversial principle that special circumstances justifying a restriction on union

insignia must be established by substantial evidence in the record. Similarly, in *St. Luke's Hospital*, 314 N.L.R.B. 434 (1994), the Board rejected the ALJ's special circumstances finding because it was based on mere conjecture: "Although the judge found that some patients might be upset by the [button's message], the record is devoid of any evidence to support this supposition . . . . [T]here is no evidence that any patient complained of, or even noticed, the stickers and buttons at issue in this case." *Id*. at 435; *see also Mesa Vista Hosp.*, 280 N.L.R.B. at 299 (holding that Respondent must introduce evidence demonstrating an adverse impact); *London Mem'l Hosp.*, 238 N.L.R.B. at 708 n.11 ("Respondent conceded that there had been no complaints by patients concerning Erickson's wearing of the button on September 24 and there is no evidence that any patient was affected adversely by, or had even taken note of, her button."); *cf. Beth Israel Hosp.*, 437 U.S. at 502 ("Especially telling is the fact that . . . petitioner, who logically is in the best position to offer evidence on . . . point, was unable to introduce *any* evidence to show that solicitation or distribution was or would be harmful.") (emphasis in original).

*NLRB v. Baptist Hospital*, 442 U.S. 773 (1979), upon which the Board relies, is not to the contrary. At issue in *Baptist Hospital* was a rule adopted by the hospital, in response to a union campaign to organize its employees, that prohibited "solicitation by employees at all times in any area of the Hospital which is accessible to or utilized by the public." *Id*. at 775 (internal quotations marks omitted). The Hospital attempted to justify this broad prohibition with testimony that the patients' recovery is more successful in a tranquil environment, and that solicitation disturbed that tranquility. *Id*. at 783. Applying its set of presumptions—that restrictions on union activities in immediate patient care areas were presumptively valid, whereas restrictions outside those areas were presumptively invalid—the Board issued an order prohibiting the Hospital from applying the solicitation ban in areas other than immediate patient care areas. *Id*. at 777. The

Sixth Circuit refused to enforce the Board's order, finding that the Hospital had justified the ban with respect to all areas of the Hospital accessible to the public. *Id.*

The Supreme Court concluded that the evidence called for a resolution in between the Court of Appeals' and Board's decisions. The Court first noted that the Board's definition of "immediate patient care areas" was limited to "patients' rooms, operating rooms, and places where patients receive treatment, such as x-ray and therapy areas." *Id.* at 780 (quoting *St. John's Hosp. & Sch. of Nursing, Inc.*, 222 N.L.R.B. 1150, 1150 (1976), *enf. granted in part and denied in part*, 557 F.2d 1368 (10th Cir. 1977)). The Court then went on to conclude that the extensive testimony presented by the Hospital established that solicitation in the corridors and sitting rooms on patients' floors also might have an adverse effect on patients' recovery because "[p]atients in the most critical and fragile conditions" can often be found in them. *Id.* at 784. Substantial evidence therefore justified the Hospital's ban on solicitation in these areas. *Id.* at 785-86. The same could not be said for "the cafeteria, gift shop, and [first-floor] lobbies," however, as the Hospital had failed to present "clear evidence of the frequency with which patients" visited those areas. *Id.* at 786. Special circumstances did not justify the ban on solicitation in those areas. *See id.* at 786-87.

Despite the Court's careful attention to the factual record, the Board misreads *Baptist Hospital*, maintaining that it stands for the broad proposition that any testimony by a hospital administrator about potential harm to patients and their family members is entitled to deference and is therefore sufficient to establish special circumstances. *Sacred Heart Med. Ctr.*, 2006 WL 1875747, at *3 & n.9.[4] It stands for no such

---

[4]Although both Sacred Heart and the Board stress potential "unease" and "disturbance" to family members as justifying the ban, *see Sacred Heart Med. Ctr.*, 2006 WL 1875747, at *2, *3, the law is clear that the Board must focus on disturbances to *patients*, not their relatives, when assessing whether special circumstances exist. *See, e.g.*, *Baptist Hosp.*, 442 U.S. at 786-87.

principle. To the contrary, the basis for the Court's determination in *Baptist Hospital* was the "extensive evidence," offered "through the testimony of doctors and a hospital administrator." *Baptist Hosp.*, 442 U.S. at 782. Their testimony tied the need for tranquility to past experiences with patients and established where patient care occurred. *Id.* at 783-84, 786. To the extent that the Court afforded any deference to the administrator and doctors, it was with respect to their opinion that the Hospital needed to maintain a tranquil environment. Significantly, the Court concluded that this testimony was insufficient to establish that patients would be disturbed in several areas of the Hospital, including the cafeteria, gift shop, and first-floor lobbies.

Notably, the witnesses in *Baptist Hospital* expressly connected the solicitation prohibition to patient well-being. *See, e.g.*, *id.* at 783. By contrast, the limited offer of proof in this case set forth no basis for the Hospital's concern. Sacred Heart's speculation about the potential effects of the safe staffing button is not, for example, substantiated by testimony about how similar buttons caused patient disturbances in the past. To the contrary, the record shows that the arguably more controversial "Staffing Crisis—Medical Errors" button, worn for months, caused no ill effects. *See Mt. Clemens Gen. Hosp.*, 328 F.3d at 848 (noting that there was no evidence that more controversial buttons had caused disturbances); *cf. Beth Israel Hosp.*, 437 U.S. at 502 (noting that the fact that hospital had previously allowed union solicitation "apparently without untoward effects," supported the Board's determination that solicitation would not disturb patients).

The Board argues that Sacred Heart need not wait for patient complaints before taking preventative action. But every case must be judged on its own record. The speculation as to potential harm in this case is far outweighed by the record evidence establishing that there was no actual harm or likelihood of harm. The record reveals that nurses wore both the "RNs Demand Safe Staffing" button and the "Staffing

Crisis—Medical Errors" button for months without incident. There were no patient complaints. Indeed, there were not even any patient questions about the button's message. Evidence of what actually occurred is far more telling than unsubstantiated conjecture about what might occur.

**[5]** " '[T]he substantial evidence test requires a case-by-case analysis and a review of the whole record,' and requires a reviewing court to 'take into account whatever in the record fairly detracts' from the Board's conclusions." *Healthcare Employees Union*, 463 F.3d at 918 (internal citations omitted). Examining the record as a whole, substantial evidence simply does not support the Board's finding that Sacred Heart met its burden of establishing special circumstances.

**[6]** WSNA's petition for review is **GRANTED** and the matter is **REMANDED** to the National Labor Relations Board with directions to reinstate the ALJ's Decision and Order.