Opinion for the Court filed by Circuit Judge WILKINS.
Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.
WILKINS, Circuit Judge:
This ease arises out of a labor dispute at six nursing homes in Connecticut operated by Petitioner HealthBridge Management. After a regional office of the National Labor Relations Board issued a complaint against HealthBridge alleging that it unfairly terminated housekeeping employees, the union that represents employees at the nursing homes distributed stickers and flyers asserting that HealthBridge had been “busted” for “violating federal labor law.” Employees posted the notices on union bulletin boards, and some wore the stickers in various areas of the nursing homes where they worked. HealthBridge took down the flyers and ordered its workers to remove the stickers while working in patient care areas. The Board concluded that the company’s conduct violated section 8(l)(a) of the National Labor Relations Act. HealthBridge petitioned for review of the Board’s order, and the Board petitioned for enforcement. For the reasons discussed below, we deny the petition for review and grant the cross-application for enforcement.
I.
Petitioners in this case are Health-Bridge Management, LLC (“Health-Bridge”) and six long-term nursing care centers the firm operates in Connecticut (the “Centers”). The Centers provide convalescent and long-term nursing care and cater to primarily elderly residents. The New England Health Care Employees Union, District 1199, SEIU, AFL-CIO (the “Union”) serves as the exclusive bargaining unit for non-managerial healthcare employees at the six Centers.
*1064 HealthBridge and the Centers have historically permitted employees to wear Union insignia at all times in both patient care and non-patient care areas. See Healthbridge Mgmt., LLC, 360 N.L.R.B. No. 118, 2014 WL 2194550, at *7 (May 22, 2014). Collective bargaining agreements (the “Agreements”) between the Union and the Centers provide that the Centers must make bulletin boards available for the display of “proper Union notices” in “a location conspicuous and accessible to workers.” E.g., J.A. 1117 (Art. 6(D)).
In March 2011, when the events that gave rise to this case occurred, Health-Bridge and the Union were engaged in a contentious renegotiation of the Agreements, which were set to expire March 16, 2011. Shortly before that date, Health-Bridge sent a series of letters to residents of the Centers and their families informing them of its side of the dispute. Health-Bridge told residents that the healthcare industry was rapidly changing, and that in order to compete with lower-cost providers, it must make changes to the Agreements, since its prior bargain with the Union was “simply no longer sustainable.” J.A. 1073-77. The letters described the Union as an intractable negotiating partner with a “ ‘take-it-or-leave-it’ approach,” and warned that the Union had threatened to call a strike if it did not get what it wanted. J.A. 1078-81. HealthBridge told its residents and their families that the Union “ha[d] a long history” of calling strikes, but that it had a contingency plan to continue services uninterrupted by hiring replacement employees if the current nursing staff went on strike. J.A. 1073-77.
On March 21, 2011, the Board’s Region 34 filed a complaint against HealthBridge alleging that three of the Centers discharged or threatened certain housekeeping employees in violation of the National Labor Relations Act (the “Act” or “NLRA”). Four days later, the Union distributed stickers to employees at each of the Centers declaring — in a message superimposed over a black-and-white image of a gavel — that the Centers had been “BUSTED March 21, 2011 By National Labor Board For Violating Federal Labor Law.” J.A. 1029, 1050. The Union also posted flyers on Union bulletin boards at the Centers stating that HealthBridge had been “BUSTED” and that the company “will do ANYTHING — even violate labor law — in [its] ruthless pursuit of more profit.” J.A. 1062-67. The flyers advised readers that “[o]n March 21st, the National Labor Relations Board issued an 18-page federal complaint against [Health-Bridge] for massive violations of federal law” and asserted that HealthBridge was trying to provoke a strike by “refusing to sign a contract extension like most other nursing home operators” and was “exploiting the elderly and their caregivers by lying, cheating and even law-breaking.” Id.
Lisa Crutchfield, HealthBridge’s Senior Vice President of Labor Relations, held a conference call that day with managers at the Centers instructing them to prohibit employees from wearing the stickers when working in resident-care areas or providing care to residents. She told managers to ask employees who refused to observe the policy to punch their time-cards out and leave the premises. At two Centers, management banned employees from wearing the stickers in any area of the facility, including non-patient care areas. Heatthbridge, 2014 WL 2194550, at *7. Crutchfield also instructed managers at the Centers to remove the flyers from the bulletin boards. A week later, Health-Bridge sent additional letters to residents and their families, informing them about the flyers, which it said were “full of misleading and false statements ... designed to try and harm the reputation of our Center in the community.” J.A. 1083-85. *1065 The letters set forth HealthBridge’s position on the “completely baseless” allegations in the Board’s March 21 complaint, explained that there had not yet been any hearing or ruling in the case, and declared that HealthBridge planned to mount a robust defense. Id.
The Union filed charges with the Board concerning the sticker ban and flyer removals. The Board subsequently filed complaints alleging that HealthBridge’s actions “interfered] with, restrain[ed], and eoerc[ed HealthBridge’s] employees in the exercise of’ their right to collective bargaining under section 7 of the Act, 29 U.S.C. § 157, in violation of section 8(a)(1) of the Act, id. § 158(a)(1). J.A. 32.
At a hearing before aii ALJ, Crutchfield testified that she ordered the stickers banned from patient care areas out of concern for residents, who might think HealthBridge had committed a crime that could impact resident care.[1] J.A. 799-800. HealthBridge also produced an expert on geriatric nursing care, Dr. llene WarnerMaron, who testified that the “busted” sticker could have posed a risk to the emotional wellbeing of vulnerable nursing home residents dependent on staff to render _care. She testified that the word “busted” has a negative connotation that suggests arrest or bankruptcy, and that seeing the word, printed in red lettering on a sticker worn by their caregivers, could cause residents to become “agitated, upset, worried, [or] concerned.” J.A. 721. Warner-Maron also told the ALJ that the sticker’s statement that the Centers had violated the law could lead residents to fear that their nursing home would be closed, and they would be transferred to a new facility, an assertion she believed could be a form of emotional abuse. She admitted, however, that she did not speak with any residents, family members, or caregivers at any of the Centers in forming her opinion.
Crutchfield testified that she ordered the flyers removed because she did not consider them “proper” within the meaning of the Agreement provision permitting the Union’s use of bulletin boards. She found them improper because they were “disparaging,” “derogatory,” and “defamatory” toward HealthBridge and falsely suggested that HealthBridge did not care about its residents or employees.[2] J.A. 774, 778. Crutchfield had previously asked her subordinates to remove other notices, including flyers stating that HealthBridge had robbed employees of vacation time, had “kick[ed employees] out the door,” J.A. 810-11, would “[t]ake away every single thing we’ve fought for,” and would “turn our nursing home into a sweatshop,” J.A. 1055-60. Other notices Crutchfield removed included postings updating Union members on changes Health-Bridge sought to the terms of the Agreements. She did not communicate with or seek to inform anyone in the Union before removing the flyers. Crutchfield acknowl *1066 edged that the Agreements did not expressly authorize HealthBridge to remove Union notices from the bulletin boards.
The ALJ determined that HealthBridge violated section 8(a)(1) of the Act by removing the flyers and banning the stickers from patient care areas at the six Centers (as well as non-patient areas at two of the Centers). A three-member panel of the Board voted unanimously to uphold the charges against HealthBridge related to the flyer removal, but split two-to-one in favor of the Union on whether the sticker ban contravened the Act. The Board determined that the prohibition on the stickers was presumptively invalid and could only be overcome by a showing of special circumstances, endorsing the ALJ’s view of the case.[3] The Board said it did not require “actual harm or a disturbance to patients” for a showing of special circumstances, but that Crutchfield and WarnerMaron’s “general and speculative testimony” was insufficient, since neither testified “based on any specific experience with a patient, family member, or employee,” and Warner-Maron had not even spoken to any residents or caregivers at the Centers. Healthbridge, 2014 WL 2194550, at *3. The majority also found the fact that Health-Bridge had itself repeatedly written to inform residents about the very labor unrest that it claimed they would find upsetting significantly weakened the force of Crutch-field’s and Warner-Maron’s testimony. Id.
The entire panel agreed that Health-Bridge was not entitled to remove the flyers because it did not produce any evidence to suggest the Agreements permitted it to unilaterally interpret what was a “proper” notice and remove items it considered improper. Id. at *1.[4]
In a partial dissent, Member Miscimarra contended that bans on union insignia in patient care areas, categorical or not, are always presumptively valid, and that the majority’s logic would require Health-Bridge to show patients actually were upset by the stickers in order to demonstrate special circumstances. Id. at *6. He argued such a requirement would force healthcare employers to allow their union practices to harm patients in order to demonstrate their actions were justified in a subsequent proceeding before the Board. He also argued that, even though she was not engaged as an expert until after the conduct at issue, Warner-Maron’s testimony was relevant to determining the existence of special circumstances, because it bolstered Crutchfield’s reasoning. Id. at *6 n. 6.
*1067 HealthBridge filed a petition for review in this Court. See 29 U.S.C. § 160(f). The Board petitioned for enforcement of its order. See id. § 160(e).
II.
The Court upholds the Board’s findings of fact if supported by “substantial evidence on the record considered as a whole.” 29 U.S.C. § 160(e), (f). The Court owes “substantial deference” to the Board’s factual inferences from the record before it, Halle Enters., Inc. v. NLRB, 247 F.3d 268, 271 (D.C.Cir.2001) (internal quotation mark omitted), and “[w]hen the Board concludes that a violation of the Act has occurred, [the Court] must uphold that finding unless it has no rational basis or is unsupported by substantial evidence.” Tenneco Auto., Inc. v. NLRB, 716 F.3d 640, 647 (D.C.Cir.2013) (internal quotation mark omitted). “It is not necessary that we agree that the Board reached the best outcome in order to sustain its decisions.” Bally’s Park Place, Inc. v. NLRB, 646 F.3d 929, 935 (D.C.Cir.2011) (internal quotation marks omitted). As for rules the Board creates for resolution of the matters that come before it, “[t]he judicial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board’s application of the rule ... must be enforced.” Beth Israel Hosp. v. NLRB, 437 U.S. 483, 501, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). In reviewing the Board’s decision, the Court must consider the “whole record,” including not only materials that support the Board’s findings but also “whatever in the record fairly detracts from its weight.” Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456. (1951).[5]
Under section 8(a)(1) of the NLRA, it is an unfair labor practice for an employer “to interfere with, restrain, or coerce employees in the exercise of’ employees’ section 7 right to “self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.” 29 U.S.C. §§ 157, 158(a)(1). The right to self-organize “necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite.” Brockton Hosp. v. NLRB, 294 F.3d 100, 103 (D.C.Cir.2002) (quoting Beth Israel Hosp., 437 U.S. at 491, 98 S.Ct. 2463). The workplace is, in fact, a particularly appropriate place for employees to communicate about self-organization, since it “is the one place where [employees] clearly share common interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees.” Eastex, Inc. v. NLRB, 437 U.S. 556, 574, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978) (alteration in original) (internal quotation marks omitted).
The Board has long recognized that employees have the right to wear union insignia in the workplace. Washington State Nurses Ass’n v. NLRB, 526 F.3d 577, 580 (9th Cir.2008) (citing London Mem’l Hosp., 238 N.L.R.B. 704, 708 (1978)). Bans on union insignia in the workplace are therefore presumptively invalid, absent a showing by the employer of “special circumstances” to support the ban. *1068 See Republic Aviation Corp. v. NLRB, 324 U.S. 793, 803-04 n. 10, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). In the healthcare context, establishing “special circumstances” requires evidence that a ban is “necessary to avoid disruption of health-care operations or disturbance of patients.” Beth Israel Hosp., 437 U.S. at 507, 98 S.Ct. 2463.
In healthcare facilities, however, this rebuttable presumption applies only to areas where patients are not cared for. In “immediate patient care areas,” bans on union insignia are not presumptively invalid. NLRB v. Baptist Hosp., Inc., 442 U.S. 773, 778, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979); Sutter East Bay Hosps. v. NLRB, 687 F.3d 424, 433 (D.C.Cir.2012). Immediate patient care areas include “patients’ rooms, operating rooms, and places where patients receive treatment, such as x-ray and therapy areas.” Baptist Hosp., 442 U.S. at 780, 99 S.Ct. 2598 (quoting St. John’s Hosp. and Sch. of Nursing, Inc., 222 N.L.R.B. 1150, 1150 (1976)). The rationale for this rule is the need to “maintain[ ] a peaceful and relaxed atmosphere,” since
Hospitals, after all, are not factories or mines or assembly plants.... [T]he patient and his family' — irrespective of whether that patient and that family are labor or management oriented — need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed.
Baptist Hosp., 442 U.S. at 783-84 n. 12, 99 S.Ct. 2598 (quoting Beth Israel Hosp., 437 U.S. at 509, 98 S.Ct. 2463 (Blackmun, J., concurring in judgment)).
A.
We first address HealthBridge’s challenge to the rule the Board applied in this case, which the firm argues is irrational and upsets the proper balance between employees’ rights and healthcare providers’ responsibilities to patients. In Saint John’s Health Center, 357 N.L.R.B. No. 170, 2011 WL 7052273, at *1-2 (2011), the Board determined that only categorical employer bans on insignia in patient care areas are presumptively valid. Where, conversely, an employer banned only certain union insignia in those areas, the Board would consider the ban presumptively invalid because, “[hjaving allowed other types of insignia to be worn in immediate patient care areas, the [hospital] may not now rely on the protection of the presumption of validity applicable to an across-the-board ban to justify its selective ban of only the specific union insignia at issue.” Id. at *2.
HealthBridge now asks us to overturn this presumption against selective insignia bans, but it gave the Board no opportunity to reconsider the presumption in the first instance. As relevant here, its exceptions to the ALJ’s findings and conclusions of law challenge only (1) the ALJ’s determination that HealthBridge did not establish special circumstances that justified its sticker ban, and (2) the ALJ’s discounting of Warner-Maron’s testimony. Nor did HealthBridge’s detailed brief before the Board challenge the Board’s presumption against selective bans; there, Health-Bridge merely cited Saint John’s as controlling authority without asking the Board to alter its policy. Brief in Support of Respondent’s Exception to Administrative Law Judge’s Decision at 19, 33, Health-bridge, 360 N.L.R.B. No. 118 (Aug. 17, 2012). In that forum, HealthBridge contended only that its selective insignia ban was consistent with Saint John’s. And HealthBridge did not seek reconsideration by the Board even though the Board split on the validity of its sticker ban and one member explicitly questioned the rationale of Saint John’s in dissent. Only now, having obtained an unfavorable outcome from the Board, has HealthBridge *1069 changed tack, and it devotes the heart of its opening brief before this Court to arguing that the presumption is contrary to the Act. See Petitioner’s Br. at 25-33.
Under section 10(e) of the Act, “[n]o objection that has not been urged before the Board ... shall be considered by the court,” absent extraordinary circumstances. 29 U.S.C. § 160(e); see also Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982); Brockton Hosp., 294 F.3d at 105-06. The Board’s rules require parties to “set forth specifically the questions of procedure, fact, law, or policy to which exception is taken” and “concisely state the grounds for the exception,” or risk waiver. 29 C.F.R. § 102.46(b). This rule “serves a sound purpose” and we are bound by it. Detroit Edison Co. v. NLRB, 440 U.S. 301, 311 n. 10, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979). Indeed, the Board’s order in Saint John’s was issued eight months before HealthBridge filed its exceptions and accompanying brief, and its brief indicates HealthBridge was aware of the policy. HealthBridge had ample time to argue to the Board that the presumption is an impermissible reading of the Act.
HealthBridge claims we should overlook its failure to apprise the Board of its claim, since the Board “explicitly addressed the validity of the policy, both in the majority opinion and in the partial dissent.” Petitioners’ Reply at 8 (emphasis omitted). This is hard to square with the language of the Board’s order, which merely restates the selective ban presumption and applies it without discussing the virtues of the rule or the extent to which it comports with the Act and its purposes. See Healthbridge, 2014 WL 2194550, at *2-4. True, the dissenting member explicitly questioned the wisdom of the presumption. .See id. at *6. But even if this gave the majority notice the presumption itself was at issue, it is insufficient to invoke our jurisdiction. HealthBridge contends that “the critical question in satisfying section 10(e) is whether the Board received adequate notice,” Petitioner’s Reply at 8, but “section 10(e) bars review of any issue not presented to the Board, even where the Board has discussed and decided the issue,” Alwin Mfg. Co. v. NLRB, 192 F.3d 133, 143 (D.C.Cir.1999) (emphasis added). Where the Board addresses an issue not raised by the parties, the party aggrieved can preserve its claim for judicial review by seeking reconsideration by the Board. Woelke, 456 U.S. at 665-66, 102 S.Ct. 2071; see 29 C.F.R. § 102.48(d) (providing for “reconsideration, rehearing, or reopening of the record after the Board decision or order”). But HealthBridge never sought reconsideration in this case. HealthBridge failed to put this issue before the Board, and we consequently lack jurisdiction over this aspect of its petition.[6]
*1070 B.
We find the Board’s conclusion that HealthBridge failed to demonstrate special circumstances in support of its ban supported by substantial evidence in the record. Our review of the Board’s determination is necessarily limited, as “the function of striking th[e] balance [between employer and employee rights] to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.” NLRB v. Local 103, Int’l Ass’n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978) (original alterations omitted) (quoting NLRB v. Truck Drivers Local 449, Int’l Brotherhood of Teamsters, 353 U.S. 87, 96, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957)). Under this deferential standard of review, HealthBridge fails to demonstrate that the Board’s finding had no rational basis or was unsupported by substantial evidence.
Crutchfield testified that she thought residents who saw the stickers “would not understand this was related to a labor matter” and might fear the Centers had been “convicted of a crime,” J.A. 799-800, but the stickers clearly stated that the company had been busted by the “National Labor Board For Violating Federal Labor Law,” J.A. 1050 (emphasis added). Far from Crutchfield’s and Warner-Mar-on’s surmise that residents would fear the shutdown of their facility and transfer to another home, the stickers made plain that the Centers had been accused of mistreating employees, not residents. An employer’s violation of labor law is quite different from a criminal conviction, and Health-Bridge introduced no evidence to demonstrate that its residents would think otherwise. Moreover, its own letters made clear that the charges stemmed from alleged labor law violations, not any infraction related to patient care.
The Board was justified in finding that it would be irrational to assume that residents would become distraught and traumatized by a two-and-a-half inch, ten-word sticker suggesting their nursing home had been caught violating labor law, but would be reassured by HealthBridge’s repeated and detailed letters to residents and their family members threatening an imminent Union strike that could lead to replacement of the entire staff that cared for their most basic needs. The Board rightly attributed significance to HealthBridge’s stream of strike-related correspondence, sent at the same time it prohibited employees from wearing the “busted” stickers. See Healthbridge, 2014 WL 2194550, at *3.
HealthBridge claims that the letters were designed to calm residents’ fears, demonstrating the “basic disconnect between the Board’s reasoning and the resident-care concerns that actually animated [HealthBridge’s] actions.” Petitioners’ Br. at 36. But the Board reasonably concluded that if the letters were intended to comfort, they were drafted exceptionally poorly. HealthBridge’s missives invoked the specter of labor unrest and potential walkouts by nurses and other healthcare workers at the Centers. HealthBridge’s own expert conceded on cross-examination that communications to residents that “imply that they might lose the care of ... *1071 their direct care provider” could constitute emotional abuse. J.A. 740-42. As the Board points out in its brief, “Crutchfield ... did not explain why, if [HealthBridge] deemed it appropriate to present residents with this parade of horribles,” it should be expected to believe residents would have been disturbed by the stickers’ message that the firm had violated labor law. Respondent’s Br. at 20. As we have previously noted, “[w]e give the Board even greater deference with respect to questions of fact that turn upon motive,” Capital Cleaning Contractors, Inc. v. NLRB, 147 F.3d 999, 1004 (D.C.Cir.1998), and here, the Board could reasonably consider “whether [HealthBridge’s banning of the “busted” stickers] was based upon anti-union animus,” id.
One can easily see how the Board could conclude that HealthBridge’s letters were intended to present HealthBridge’s side of renegotiation and to elicit sympathy for its bargaining position, rather than calm patients. See, e.g., J.A. 1083-85 (describing Union flyers as “full of misleading and false statements ... designed to try and harm the reputation of our Center[s] in the community” and characterizing the Board’s March 21 complaint as unfounded). In confronting similar attempts by healthcare employers to stifle union solicitation, we have held that employer discrimination between a union’s message about a labor dispute and the employer’s own public communications on the same issue seriously weakens the justification for a ban. Stanford Hosp. and Clinics v. NLRB, 325 F.3d 334, 339 (D.C.Cir.2003). We decline to sanction a blatant double standard in favor of employers in this case.
HealthBridge also failed to adduce evidence showing the stickers were objectively disturbing. In Baptist Hospital, the Supreme Court held that the “extensive” testimony of two physicians at the hospital that they had observed care disrupted when patients thought their doctor was focused on anything other than patient care “related [the ban on solicitation] directly to the well-being of patients.” 442 U.S. at 782-83, 99 S.Ct. 2598. Key to Baptist Hospital’s finding of special circumstances was the doctors’ and an administrator’s ability to “tie[ ] the need for tranquility to past experiences with patients.” Washington State Nurses Ass’n, 526 F.3d at 584 (citing Baptist Hosp., 442 U.S. at 783-84, 99 S.Ct. 2598); see also Mt. Clemens General Hospital. v. NLRB, 328 F.3d 837, 847 (6th Cir.2003) (evidence required to rebut a presumption of invalidity must go beyond mere “speculation”).
In contrast, HealthBridge produced no testimony from any healthcare professional drawn from experience in caring for patients at the Centers. The only Health-Bridge employee who testified in support of the sticker prohibition was Crutchfield, an attorney who testified that her duties are to “oversee the development of labor relations strategy,” human resources, and implementation of collective bargaining agreements. J.A. 766.
Furthermore, the Board reasonably found that Crutchfield’s and Warner-Mar-on’s testimony was speculative and conjectural. Crutchfield traced her opinion to no actual interactions with or comments from residents, family members, or employees. She cited no evidence showing the likelihood that patients would be harmed, either empirical or anecdotal. Nor did she attempt to differentiate the “busted” stickers from other insignia HealthBridge had permitted in the past. See Washington State Nurses Ass’n, 526 F.3d at 584 (testimony that nurse managers had expressed their concern about the impact of buttons on patients did not show how prohibited buttons differed from similar buttons worn before that “caused no ill effects”); Mt. Clemens Gen. Hosp., 328 F.3d at 848 (no justification for ban on buttons protesting *1072 “forced overtime” in intensive care units because hospital did not show “openly contentious” buttons previously worn in patient care areas were “singularly disturbing and disruptive”).
HealthBridge contends that the Board held it to a standard contrary to our precedent by requiring it show “actual complaints from residents.” Petitioners’ Br. at 33; see Brockton Hosp., 294 F.3d at 104 (a hospital need only show “a likelihood of, not actual, disruption or disturbance”) (citing Baptist Hosp., 442 U.S. at 781 n. 11, 99 S.Ct. 2598). The Board did no such thing. In fact, it clarified that it did “not require actual harm or a disturbance to patients.” Healthbridge, 2014 WL 2194550, at *4. The infirmity in Crutchfield’s testimony was that it was “not based on any specific experience with a patient, family member, or employee” or “specific evidence of harm or likelihood of harm to patients from employees wearing the sticker.” Id. at *3.
Likewise, when it demanded that Warner-Maron’s opinion be “informed by actual information about or experience with the facilities, their staff, or their patients” or by speaking to “patients, family members or care givers,” the Board was not requiring the stickers be shown to patients, but rather that she speak to them to gauge whether they were sufficiently vulnerable that the stickers would confuse or upset them. Id. at *3. Had WarnerMaron actually spoken with residents or caregivers, she could have determined what sort of phrases or images would endanger them and whether HealthBridge’s own attempts to contextualize the Board’s complaint would assuage potential fears. Instead of asking patients about what they would find upsetting, however, WarnerMaron’s opinion rested on googling the word “busted” and concluding the results would upset elderly residents.[7] Her speculation, untethered as it was from any patient or staff interviews or visits to the Centers, was of little use in determining why these stickers, in contrast to the insignia nurses have worn in the past, merited prohibition.
The dissent’s point about expert evidence is misplaced. It is, of course, true that, for expert evidence to be admissible, it need not be based on eyewitness observation of the conduct at issue in a case, but the Board as fact-finder was entitled to determine the weight it would accord Warner-Maron’s evidence. The Board could reasonably discount her testimony not only because her entire review of materials in preparation for the hearing was comprised of looking at the stickers and using her internet browser to look up the word “busted,” but also because her concerns about the “busted” sticker could reasonably be deemed inconsistent with her lack of concern with the patient letters sent by HealthBridge and the other union insignia that HealthBridge had previously allowed. The Board could reasonably agree with the ALJ’s assessment that Warner-Maron’s opinion was speculative and of the same ilk as the ipse dixit that courts routinely discount as entitled to little, if any, weight. Cf. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). “Since the Board is obviously best situated to assess the credibility and demeanor of [expert] witnesses, this court must defer to that judgment so long as it is reasonable.” Carstens v. Nuclear Regulatory Comm’n, 742 F.2d 1546, 1553 (D.C.Cir.1984).
*1073 Our role is not to substitute our judgment for that of the Board; “[rjather, a reviewing court must ‘ask whether a reasonable mind might accept a particular evidentiary record as adequate to support a conclusion.’ ” Harry T. Edwards & Linda A. Elliott, Federal Standards of Review: Appellate Review of District Court Decisions And Agency Actions 176 (2007) (quoting Dickinson v. Zurko, 527 U.S. 150, 162, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)). “Or, put differently, ... whether, on the record under review, ‘it would have been possible for a reasonable jury to reach the [agency’s] conclusion.’ ” Id. (alterations in original) (quoting Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 366-67, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998)).” The Board’s conclusion that Health-Bridge’s ban on the “busted” stickers violated section 8(a)(1) meets this standard, and it is therefore supported by substantial evidence in the record.[8]
III.
The Board’s finding that Health-Bridge violated the NLRA by removing the “busted” notices from Union bulletin boards also finds substantial support in the record. Having extended the right to post Union notices on designated bulletin boards, the company was not free to remove them unilaterally based on its conclusion that they were “disparaging” or inaccurate.
Unions and employees have “no statutory right ... to use an employer’s bulletin board.” NLRB v. Honeywell, Inc., 722 F.2d 405, 406 (8th Cir.1983) (internal quotation mark omitted). However, once an employer permits employees access to a bulletin board, the union’s right to post takes on the protection of section 7 of the Act. Union Carbide Corp. v. NLRB, 714 F.2d 657, 660-61 (6th Cir.1983). Naturally, an employer that grants employees or a union access to bulletin boards may use its collective bargaining agreement (or past practice) to impose “limitations, restrictions, and regulations” on those rights, Stevens Graphics, Inc., 339 N.L.R.B. 457, 461 (2003), but it cannot discriminate against union-related material without violating the Act. NLRB v. Southwire Co., 801 F.2d 1252, 1256 (11th Cir.1986). “The critical question is whether the employer is discriminating against union messages, or if it has a neutral policy of permitting only certain kinds of postings.” Loparex LLC v. NLRB, 591 F.3d 540, 545 (7th Cir.2009) (citing Fleming Cos. v. NLRB, 349 F.3d 968, 975 (7th Cir.2003)).
At the outset, it is worth noting that the Union bulletin boards were located in employee break rooms. Thus, HealthBridge cannot argue that it removed the flyers to protect patients because the flyers, unlike the stickers, were not placed where patients would see them. The flyers could not pose any threat of upsetting patients, but HealthBridge argues that it was entitled to remove them as not “proper” postings under the Agreements and as unprotected Union speech under the NLRA.
HealthBridge argues that the Agreements’ requirement that Union notices be “proper” permitted it to adopt a policy mandating the removal of “derogatory, disparaging, or inaccurate postings.” Petitioners’ Br. at 40.[9] Presumably, since *1074 Crutchfield “discretely [sic]” removed the Union’s notices without first notifying the Union, Healthbridge, 2014 WL 2194550, at *7, HealthBridge also believes the Agreements entitle it to unilaterally determine what postings warrant removal without consulting or even notifying the Union.[10] See Petitioner’s Br. at 41. As Crutchfield acknowledged in her testimony, however, HealthBridge did not reserve any control over the Union bulletin boards in the Agreements and did not define what constitutes a “proper” notice. Crutchfield’s belief that certain notices were inaccurate did not empower her to remove the notices, because a union’s expression of opinion on a labor dispute constitutes a “proper” notice. Monongahela Power Co. v. NLRB, 62 F.3d 1415, 1995 WL 463108, at *8 (4th Cir.1995) (unpublished opinion). Having bargained with the Union to permit it to communicate with members regarding the status of collective bargaining, HealthBridge was not free to “stifle any dissemination of information about” the Board’s charges, even if it considered the Union’s portrayal of the facts wrong. Monongahela Power Co., 314 N.L.R.B. 65, 68-69 (1994); cf. Eastex, Inc., 437 U.S. at 573, 98 S.Ct. 2505 (“Petitioner’s only cognizable property right ... is in preventing employees from bringing literature onto its property and distributing it there — not in choosing which distributions protected by § 7 it wishes to suppress.”). And the mere fact that HealthBridge considered the notices disruptive or unpleasant is insufficient to warrant their removal. NLRB v. Container Corp. of Am., 649 F.2d 1213, 1215 (6th Cir.1981).
HealthBridge claims that, even though the notices were protected under section 7, it was entitled to remove them because of what it terms their “abusive and disparaging” content. Petitioners’ Br. at 45. Union bulletin board notices, however, are protected even if “abusive” or “insulting.” Union Carbide Corp., 714 *1075 F.2d at 661 (citing Old Dominion Branch No. 496, Nat’l Ass’n of Letter Carriers v. Austin, 418 U.S. 264, 283, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974)). Only two exceptions apply to this protection. First, “where the bulletin boards threaten to become a battleground for competing groups,” the employer may regulate materials the union posts. Union Carbide Corp., 714 F.2d at 661 (internal quotation marks omitted). Second, even “ ‘the most repulsive speech enjoys immunity provided it falls short of a deliberate or reckless untruth,’ so long as the allegedly offensive actions are directly related to activities protected by the Act and are not so egregious as to be considered indefensible.” Container Corp. of Am., 244 N.L.R.B. 318, 319 (1979) (quoting NLRB v. Cement Transp., Inc., 490 F.2d 1024, 1029-30 (6th Cir.1974)). The “busted” notice does not relate to any “battle” among competing unions, and is not so egregious that it loses the protection of the Act. In Container Corporation, the Sixth Circuit held that language comparing a manager to a slave driver who would be happy paying his “chain gang” retained the protection of section 7. 649 F.2d at 1214-15. In another case, it upheld a finding that the company improperly removed a union posting for criticizing the company’s safety record. United Parcel Serv., Inc. v. NLRB, 228 F.3d 772, 781 (6th Cir.2000). Similarly, telling readers that HealthBridge was “exploiting the elderly and their caregivers by lying, cheating and even law-breaking” and wanted “to destroy our jobs, our families and our neighborhoods,” J.A. 1062-67, was certainly “unpleasant,” Container Corp., 649 F.2d at 1216, but nonetheless was protected by the Act. We are left with the impression that HealthBridge attempted to remove the notices “simply because it disagree[d] with their contents or [found] them distasteful.” Monongahela Power Co., 1995 WL 463108, at *9. The Board was within reason in concluding that the Union’s flyers were a protected union communication. We therefore uphold the Board’s determination that HealthBridge’s removal of the “busted” notices violated section 8(a)(1) of the Act.
IV.
For the foregoing reasons, we deny the petition for review and grant the cross-application for enforcement.
So ordered. •

. Specifically, Crutchfield averred:
My concern was that if a resident was being cared for by somebody wearing this sticker it may cause confusion. The resident may not understand what — the sticker itself says busted with a judge’s gavel. And it’s saying that the center was busted. It suggests some kind of crime. I was concerned that residents would think — would not understand this was related to a labor matter and might be concerned for a larger issue. What is happening here at this center? Has this center been convicted of a crime? Is that impacting the care that I’m receiving? So my concern was that residents may be upset by this, may not understand it and it may create confusion and disruption for them.
J.A. 799-800.

. Asked for examples of a "proper” notice, Crutchfield listed those informing Union members about the date and time of meetings, contract negotiations, and other Union-related events.

. The ALJ had concluded that, although a health care center's ban on all non-employer insignia in patient care areas is presumptively valid, a selective ban on only certain union insignia is not entitled to a presumption of validity, and can only be justified by a showing of special circumstances. Healthbridge, 2014 WL 2194550, at *7 (citing Saint John’s Health Ctr., 357 N.L.R.B. No. 170, 2011 WL 7052273, at *1-2 (2011)). He determined that HealthBridge could not demonstrate special circumstances, which would have required proof that the ban was "necessary to avoid disruption of health care operations or disturbance of patients,” because there was no evidence to support Crutchfield’s "speculative” belief that the stickers would cause resident concerns, and Warner-Maron's post-hoc expert testimony had not served as the basis of the ban. Id.

. The ALJ concluded that the Union’s use of the term "busted” on the flyers was not inaccurate, given that the Board had issued a complaint against HealthBridge for violations of labor law, and that even if the flyers’ statements were inaccurate, "at most, it would constitute ‘biased, prounion opinion,’ ” which was insufficient to empower HealthBridge to remove them. Healthbridge, 2014 WL 2194550, at *7 (quoting Roll & Hold Warehouse & Distrib. Corp., 325 N.L.R.B. 41, 51 (1997)).

. Our dissenting colleague, while acknowledging the deferential nature of our review of Board findings of fact, nonetheless picks apart the Board's findings because the Board did not credit all of HealthBridge’s evidence and did not give HealthBridge the benefit of all inferences. That approach is decidedly inconsistent with the deferential inquiry Congress has imposed on us in the NLRA.

. HealthBridge also contests as retroactive the Board’s application of its presumption against selective insignia bans in patient care areas in this case. Petitioners’ Br. at 32-33. Under this Circuit’s law, "retroactive effect is appropriate” for adjudicatory rules — such as those articulated in Saint John’s — that are "new applications of existing law, clarifications, and additions” rather than the "substitution of new law for old law that was reasonably clear.” Verizon Tel. Cos. v. FCC, 269 F.3d 1098, 1109 (D.C.Cir.2001) (internal citation omitted). Saint John's constituted, at most, a more conclusive statement of the Board's prior position. See Mt. Clemens Gen. Hosp., 335 N.L.R.B. 48, 50 (2001) (stating that the ”normal[]” presumption of validity for bans on union insignia in patient care areas does not apply to a ban on one item where "other insignia or union buttons” are permitted). Moreover, although Health-Bridge states that it “plainly relied in good faith on the traditional presumption of validity [of insignia bans] in patient-care areas” in banning the "busted” stickers, Petitioner’s Reply at 9, it “fail[s] to identify any likely type of reliance.” Dist. Lodge 64, Int'l Ass’n of Machinists & Aerospace Workers v. NLRB, 949 *1070 F.2d 441, 448 (D.C.Cir.1991). It could not, for instance, have reacted by enacting a wholesale ban on insignia in patient care areas; that ship had already sailed because it had long permitted other Union buttons in those areas. What HealthBridge seems to be saying is that, had it known it would have to establish special circumstances to justify its ban, it would have done more to determine whether patients would actually find the stickers disturbing, but since it claims patient concerns alone animated its ban, it should have done that anyway.

. HealthBridge caricatures the Board's concerns as relating to the fact that WarnerMaron "used Google to look up the definition of a word instead of, apparently, consulting a paper copy of Websters.” Petitioners’ Reply Br. at 10 n. 2. In fact, the Board considered her testimony insufficient because it did not elucidate what a patient — rather than an internet search engine — would have thought the term “busted” meant.

. HealthBridge did not challenge the ALJ’s finding that two of its Centers banned nurses from wearing the “busted” stickers in non-patient care areas in its exceptions to the Board. It has therefore waived this argument. See 29 U.S.C. § 160(e); 29 C.F.R. § 102.46(b).

. HealthBridge’s argument that the Board should have resolved the flyers issue under section 8(a)(5) — which relates to the implementation of collective bargaining agreements — is mistaken. First, the Supreme Court long ago held that the Board is empowered to interpret a collective bargaining *1074 agreement in the course of deciding an unfair labor practice charge under section 8(a)(1). NLRB v.C & C Plywood Corp., 385 U.S. 421, 429-30, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967). And although the Board's decision does discuss the parties' expectations about what would constitute a "proper” notice, see Healthbridge, 2014 WL 2194550, at *1, the Board's decision affirmed an ALJ order that focused not on whether HealthBridge had a right to remove the flyers under the Agreements, but whether its unilateral interpretation of the Agreements to permit it to remove flyers it deemed "abusive” or "derogatory” violated employees’ right to communicate about HealthBridge's treatment of its workers. This falls squarely under section 8(a)(1). See Cent. Hardware Co. v. NLRB, 407 U.S. 539, 543, 92 S.Ct. 2238, 33 L.Ed.2d 122 (1972) ("Early in the history of the administration of the Act the Board recognized the importance of freedom of communication to the free exercise of organization rights.”).

. Even if the Union had been aware of the prior removals, Crutchfield’s prior orders to administrators to remove other Union flyers are irrelevant. Roll & Hold Warehouse & Distribution Corp., 325 N.L.R.B. 41, 51 (1997) ("A union does not waive its statutory rights ... by failure to object to past instances of unilateral changes in employment policy.”), enfd, 162 F.3d 513, 521 (7th Cir.1998).
Moreover, even if HealthBridge had removed the notices pursuant to a neutral policy it consistently implemented, as it claims, their removal in the midst of a heated renegotiation of the Agreements reinforces the Board's concerns about the company's motivations. In Loparex, the Seventh Circuit found it sufficient to uphold the Board’s finding of a violation that management's new policy requiring prior approval of bulletin board postings followed "immediately after a three- or four-month period in which [the company] witnessed an uptick in employees' organizing efforts,[1]’ even though there was no direct evidence the company had removed union notices. 591 F.3d at 547; cf. Sutter East Bay Hosps., 687 F.3d at 433 (upholding the Board's finding that a hospital changed solicitation rules in order to "squelch union activity” when it suddenly began to prohibit outside groups from meeting in the cafeteria).

. I agree that HealthBridge's removal of the BUSTED flyer from union-designated bulletin boards constituted an unfair labor practice. I also agree with my colleagues that Health-Bridge waived its challenge to the Board's presumption of invalidity for selective insignia bans in immediate-patient-care areas. See Maj. Op. 1068-69. I note, however, that the Board has never provided a good — or really any — -justification for presuming that selective bans on union insignia in patient-care areas are invalid while presuming that categorical bans are valid. Given the Supreme Court's observation that “[h]ospitals carry on a public function of the utmost seriousness and importance,” that they “give rise to unique considerations that do not apply in the industrial settings with which the Board is more familiar” and, critically, that "[t]he Board should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized,” Baptist Hosp., 442 U.S. at 790, 99 S.Ct. 2598, one would expect more than the cursory explanation courts have seen to date. Cf. id. at 791, 99 S.Ct. 2598 (Burger, C.J., concurring in judgment) ("I would think no ‘evidence’ is needed to establish the proposition that the primary mission of every hospital is care and concern for the patients and that anything which tends to interfere with that objective cannot be tolerated. A religious choir singing in a hospital chapel may well be desirable but if that interferes with patient care, it cannot be allowed.”).