# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-3433
_____

North Memorial Health Care

*Petitioner*

v.

National Labor Relations Board

*Respondent*

_____

No. 16-3657
_____

National Labor Relations Board

*Petitioner*

v.

North Memorial Health Care

*Respondent*

_____

National Labor Relations Board

_____

Submitted: April 5, 2017
Filed: June 21, 2017

_____

Before BENTON, BEAM, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

North Memorial Health Care (North Memorial or the hospital) owns and operates a health care facility in Robbinsdale, Minnesota (the facility). On June 24, 2014 the Service Employees International Union (SEIU) and the Minnesota Nurses Association (MNA) held an informational picket outside of the facility. The unions later filed multiple unfair labor practice charges against the hospital related to its conduct during the summer of 2014. An administrative law judge (ALJ) determined that the hospital had committed multiple violations of the National Labor Relations Act (NLRA or the Act). The National Labor Relations Board (the Board) unanimously affirmed the ALJ's rulings, findings, and conclusions. The hospital has petitioned for review, and the Board has filed a cross application for enforcement of its order. We grant the cross application for enforcement in part, and we grant the petition for review in part.

I.

North Memorial owns a health care facility in Robbinsdale, Minnesota. SEIU represents four bargaining units there which have over 900 employees, and MNA represents approximately 980 staff registered nurses at the facility. A joint informational picketing event by the unions was held outside the facility on June 24, 2014. Collective bargaining agreements were in effect for all SEIU and MNA bargaining units at all times relevant here.

Prior to the summer of 2014, SEIU and MNA nonemployee union representatives regularly visited the facility's public cafeteria in order to talk with off

-2-

duty employees.  MNA representatives Joseph McMahon and Karlton Scott visited the facility one to three times a week and used the cafeteria on most of those days. SEIU organizer Frederick Anthony visited the facility at least every other day and usually spent time in the cafeteria during his visits.  The union representatives generally used the cafeteria as a place to engage in informal conversations with employees.  Hospital officials were aware that the union representatives used the cafeteria.

There is no evidence in the record suggesting that the hospital had a generally applicable policy or practice which prohibited solicitation or gathering in the cafeteria.  Article 1(h) of the collective bargaining agreement (CBA) between North Memorial and SEIU states that SEIU "shall have access . . . to such other nonpatient nonpublic areas to be designated by the Hospital."  The hospital has designated two nonpublic areas for SEIU to meet with employees—a few tables in the lower level of the facility below the atrium and a space off of a hallway near an underground tunnel. The CBA between North Memorial and MNA does not discuss where MNA may interact with employees, but the hospital has designated a room on its lower level as an MNA office.  Neither of the bargaining agreements mention any union right to access public spaces within the facility.

On four occasions prior to the summer of 2014, the hospital had interfered with SEIU's attempt to use the cafeteria to hold a meeting or other activity.  Twice the union was holding a prearranged meeting in the cafeteria, and once the union was attempting to hold a contract vote there.  Before the latter, a nonemployee union representative had publicized that he would be in the cafeteria to discuss his candidacy for SEIU president.  After the first two cafeteria meetings, the hospital told SEIU that it could not hold meetings, activities, or events in the cafeteria, but it could use that area to interact informally with off duty employees.  In contrast, the hospital did not interfere with MNA's use of the cafeteria until June 2014.

-3-

In early June 2014 both unions notified the hospital that they were going to engage in a joint informational picket on public property adjacent to the facility on June 24. The unions informed the hospital that the purpose of the picket was to promote safe staffing levels. The hospital initially anticipated the picket would likely attract a large crowd, but it did not expect it to affect its ability to care for patients.

On June 23, the day before the picketing, SEIU representative Frederick Anthony and MNA representative Karlton Scott planned to meet in the cafeteria and then place picket information on bulletin boards throughout the facility. Anthony arrived before Scott, purchased lunch in the cafeteria, and began eating. He had flyers about the picket in a closed folder on his table. When employees approached him to ask questions about the picketing, he gave them a flyer. Anthony did not circulate through the cafeteria or initiate conversations with anyone. When Scott arrived, he sat at Anthony's table and began working on a laptop computer while Anthony finished eating.

While Anthony and Scott were sitting in the cafeteria, they were approached by the hospital's director of employee and labor relations, Jeffrey Cahoon, and its labor relations representative, George Wesman. Anthony was talking to an off duty employee when Cahoon and Wesman confronted him and Scott. Cahoon accused them of holding a meeting in the cafeteria which Anthony denied. Cahoon replied that he would consider how to respond, but the hospital might file an unfair labor practice charge against them. Anthony and Scott then left the cafeteria and began posting information on bulletin boards throughout the facility until hospital officials had them escorted out of the building. The hospital also gave them written trespass warnings banning them from the facility for one year.

On the same day Melvin Anderson, an employee of the hospital and an SEIU steward, posted information about the picket on a bulletin board in the sterile processing and dispensing department (SPD). Hospital officials then removed the

posting and told Anderson he was not allowed to post union information on the SPD bulletin board. The next day Wesman asked Anderson if he had placed the SEIU information on the SPD bulletin board. As they talked, Wesman accused Anderson of violating the CBA and questioned him about Anthony's involvement in the bulletin board posting.

More than five hundred people participated in the picket on June 24. On that day the hospital employed extra security guards and posted employees at three locations inside the facility to serve as greeters. The hospital instructed the greeters and security guards to approach anyone who was wearing a SEIU or MNA shirt or who was carrying a picket sign and ask them to stop displaying the shirt or sign or exit the building.

At some point on that day, Richard Geurts, an off duty registered nurse and MNA member, entered the facility wearing a MNA shirt. The shirt had the MNA insignia on the front; the back was blank. Many of the picketers were wearing the same shirt. A senior human resources executive approached Geurts in the atrium and told him he could not wear the MNA shirt in the facility that day. Geurts asked the executive whether he should take the shirt off in the atrium. The executive responded by either telling Geurts to take off the shirt or by saying he did not care. Geurts removed his shirt, which left him bare chested in the atrium until he pulled another shirt out and put it on.

MNA president Linda Hamilton and SEIU president Jamie Gulley attended the June 24 picket. After the union presidents participated in the picket that morning, they entered the facility around midday and headed towards the cafeteria. They were both wearing shirts bearing the insignia of their respective unions. Hamilton and Gulley purchased lunches and sat at a table in the cafeteria. While they were eating, union members approached them to ask questions. After the two had finished their lunches and were walking out of the facility, they were told by three separate hospital

employees that they could not wear their union shirts in the facility. The two presidents refused to either leave or take off their shirts and decided to return to the cafeteria. While they were on their way some six security guards surrounded them and told them they could not conduct union business in the cafeteria.

Gulley and Hamilton continued on into the cafeteria where they sat down at a table with between three to seven union members. This was not a prearranged meeting. The hospital's labor relations representative, Jeffrey Cahoon, approached them and said they could not conduct union business in the cafeteria. Gulley responded by stating that he was just talking to some union members he knew. Cahoon asked whether they were "talking about the Twins" or "talking about union business." Gulley responded that such a question was illegal to ask. Cahoon then stated that since they were in a public cafeteria, Gulley could not stop him from sitting next to them. Cahoon proceeded to sit three to six feet away and observe their activities. Wesman and the hospital's security manager, Rick Ramacher, joined Cahoon at his table. After this incident, some or all of the employees sitting with Gulley and Hamilton left. Hamilton and Gulley then left the facility.

Three days after the picket, the hospital terminated Melvin Anderson who had worked for the hospital for eleven years. The hospital cited a record of tardiness as the reason for his termination. After Anderson's termination, he was hired as an SEIU organizer. Anderson entered the hospital on August 21, 2014 and proceeded to the cafeteria. He had with him a small rolling backpack which contained union flyers and materials. While he was in the cafeteria, Anderson approached an employee whom he had not yet met and began talking with him. Wesman went up to them and told Anderson he was not allowed to conduct union business in the cafeteria. Wesman and a security guard then escorted Anderson out of the hospital.

The unions filed unfair labor practices charges against the hospital relating to these events during the summer of 2014. The Board's General Counsel subsequently

issued a formal complaint against the hospital. A hearing was held before an ALJ, after which the judge determined that the hospital had violated the NLRA. These violations include: (1) discharging Anderson because of his union activity; (2) ejecting Anthony and Scott from the facility and banning their reentry for one year; (3) removing union literature posted by Anderson on the SPD bulletin board; (4) interrogating Anderson in August 2014; (5) interfering with union activities in the public cafeteria in June and August of 2014; (6) engaging in surveillance of Gulley and Hamilton on June 24; and (7) prohibiting Geurts, Gulley, and Hamilton from wearing shirts displaying union insignia on June 24. The ALJ dismissed additional allegations which are not at issue here.

The Board unanimously affirmed the ALJ's rulings, findings, and conclusions. It also adopted a modified enforcement order. The hospital petitions for review of the charged violations 5, 6, and 7.

## II.

The hospital does not contest the Board's conclusions that it violated the NLRA by (1) discharging Anderson based on his union activity; (2) ejecting union representatives Anthony and Scott from the facility and banning their reentry for one year; (3) removing union literature that Anderson had posted on a SPD department bulletin board; and (4) interrogating Anderson on August 21, 2014. The Board is thus entitled to summary enforcement of these uncontested portions of its order. See NLRB v. Bolivar-Tees, Inc., 551 F.3d 722, 727 (8th Cir. 2008).

## III.

The hospital petitions for review of the Board's determination that it violated the NLRA by (1) interfering with union activities in the public cafeteria in June and August of 2014; (2) engaging in surveillance of Gulley and Hamilton on June 24; and

(3) prohibiting Geurts, Gulley, and Hamilton from wearing shirts displaying union insignia on June 24. We will enforce a Board's order "as long as [it] has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole." Cintas Corp. v. NLRB, 589 F.3d 905, 912 (8th Cir. 2009) (internal quotation marks omitted). We define substantial evidence to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). This "standard of review affords great deference to the Board's affirmation of the ALJ's findings." Id. (internal quotation marks omitted).

## A.

The hospital first contests the Board's determination that it violated Sections 8(a)(1) and 8(a)(5) of the NLRA when it interfered with nonemployee union representatives' use of the cafeteria on June 23, June 24, and August 21 of 2014. We analyze the alleged violations of Sections 8(a)(1) and 8(a)(5) in turn.

## 1.

The Board determined that the hospital's interference with the nonemployee union representatives' use of the facility's cafeteria was discriminatory and therefore violated Section 8(a)(1) of the NLRA. Section 7 of the Act states that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by Section 7. 29 U.S.C. § 158(a)(1).

Although the NLRA primarily confers rights on employees, not nonemployee union representatives, "insofar as the employees' 'right of self-organization depends in some measure on [their] ability . . . to learn the advantages of self-organization

-8-

from others,'" Section 7 of the NLRA "may, in certain limited circumstances, restrict an employer's right to exclude nonemployee union organizers from his property." Lechmere, Inc. v. NLRB, 502 U.S. 527, 532 (1992) (quoting NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 113 (1956)). The Board's General Counsel can prove that an employer's exclusion of nonemployee union representatives from its property violated Section 8(a)(1) by showing that "that the employer's access rules discriminate against union solicitation." Id. at 535 (quoting Sears, Roebuck & Co. v. San Diego Cty. Dist. Council of Carpenters, 436 U.S. 180, 205 (1978)).

The hospital first argues that the Board incorrectly applied the law because it stated that nonemployee union representatives have a presumptive right of access to an employer's property. The ALJ's decision began its analysis of the actions in the cafeteria by reciting the rule from Beth Israel Hospital v. NLRB, 437 U.S. 483, 507 (1978), that a hospital presumptively violates the NLRA by preventing union activities in areas other than immediate patient care areas. That rule, however, only applies to employees—not nonemployee union representatives. Compare id., with Babcock, 351 U.S. at 112. The ALJ's decision, however, went on to state that an employer violates the Act by denying nonemployee union representatives access to its property in a discriminatory manner. See Babcock, 351 U.S. at 112; see also Lechmere, 502 U.S. at 535. The ALJ then applied the discrimination rule to the instant facts and determined that the hospital had "violated the Act by discriminating against the union-related conversations that non-employee union representatives" had been attempting to have in the cafeteria. Although the ALJ's decision recited inapplicable law from Beth Israel, it later cited the applicable rule from Babcock and applied that rule to the facts. We therefore will not deny enforcement on this ground.

The hospital also argues that the Board's determination that the General Counsel met the burden of proof on its access discrimination claim is not supported by substantial evidence. We disagree. The hospital's cafeteria was open to the public, and there is no evidence that it had a policy prohibing gatherings or

solicitations in the cafeteria. Indeed, at least three employees testified at the hearing before the ALJ that absent the events surrounding this lawsuit, hospital representatives had never interfered with any of their prior conversations in the cafeteria. In all three of the instances here, the nonemployee union representatives were engaging in activities that are customary in the use of a public cafeteria. On all three occasions the hospital representatives stated that they were interfering with the nonemployee union representatives' use of the cafeteria because of their union affiliations. Moreover, on June 24 Cahoon told the union presidents that they could "talk about the Twins" with off duty employees in the cafeteria, but they could not "talk about union business."

The hospital cites several cases in support of its argument that the General Counsel did not meet its burden of proof. See Stanford Hosp. & Clinics v. NLRB, 325 F.3d 334, 345 (D.C. Cir. 2003); NLRB v. S. Md. Hosp. Ctr., 916 F.2d 932, 937 (4th Cir. 1990); Baptist Med. Sys. v. NLRB, 876 F.2d 661, 664 (8th Cir. 1989); St. Luke's Mem'l Hosp., 342 N.L.R.B. 1040, 1042 (2004). These cited cases are not persuasive, however, because in each case the employer had a generally applicable no solicitation policy that the General Counsel had to prove was enforced in a discriminatory manner.

The record here is more analogous to New Jersey Bell Telephone Co., 308 N.L.R.B. 277 (1992). In that case, the Board determined that the employer's "rule that a union representative obtain permission from management before conducting union business on the [company's] premises during company time" violated the Act because the "rule on its face discriminates against union activity." Id. at 280–81. The Board supported this determination in noting that the rule did not apply, for example, if a nonemployee union organizer sought to talk to employees about baseball. Id. at 281 n.16. Similar to the employer in New Jersey Telephone, North Memorial discriminated against union representatives when it interfered with their conduct on the basis of their union affiliation.

-10-

Finally, the hospital argues that the Board should have considered whether special circumstances particular to the picket justified its interference with Gulley and Hamilton in the cafeteria on June 24. This argument relies on Beth Israel's statement that a hospital may justify an access restriction by proving that a ban is "necessary to avoid disruption of health-care operations or disturbance of patients." 437 U.S. at 507. As noted above, however, Beth Israel only applies to union activities by employees, not by nonemployee union representatives, and access limitations for these two groups are governed by different standards. Compare Beth Israel, 437 U.S. at 507, with Babcock, 351 U.S. at 112. The hospital does not cite a case which applies the special circumstance justification to a situation involving nonemployees, and we cannot find one. The hospital's reliance on a special circumstances justification is therefore inapposite.

For these reasons, we deny the hospital's petition for review of the Board's determination that it violated Section 8(a)(1) by interfering with nonemployee union representatives' use of its cafeteria on June 23, June 24, and August 21.

2.

The hospital also contests the Board's determination that it violated Section 8(a)(5) of the NLRA by unilaterally changing its policy regarding cafeteria access to nonemployee union representatives on June 23, June 24, and August 21. Section 8(a)(5) of the NLRA prohibits an employer from "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5).[1] An employer violates Section 8(a)(5) if it unilaterally changes a term or condition of employment

---

[1]We note that a "violation of Section 8(a)(5) of the Act produces a derivative violation of Section 8(a)(1)." St. John's Mercy Health Sys. v. NLRB, 436 F.3d 843, 846 n.5 (8th Cir. 2006).

-11-

which is a mandatory subject of bargaining without providing the union with notice and opportunity to bargain. See NLRB v. Katz, 369 U.S. 736, 743 (1962). Terms or conditions of employment may be express or implied. Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n, 491 U.S. 299, 311 (1989). Implied terms can be established by the past practice of the parties. Id.

The General Counsel has the burden to prove that an employer unilaterally changed a past practice concerning a mandatory subject of bargaining. Nat'l Steel & Shipbuilding Co., 348 N.L.R.B. 320, 323 (2006), enforced, 256 F. App'x 360 (D.C. Cir. 2007). Not every unilateral change to access rules violates Section 8(a)(5). Peerless Food Prods., 236 N.L.R.B. 161, 161 (1978). The employer's restriction of a union's access to employees must "amount to 'a material, substantial, and significant'" change for it to violate the NLRA. Id. (quoting Rust Craft Broad. of N.Y., Inc., 225 N.L.R.B. 327, 327 (1976)). An incumbent union's ability to access unit employees for purposes of representation "is a mandatory subject of bargaining." Unbelievable, Inc., 323 N.L.R.B. 815, 817 (1997), enforced in part, 118 F.3d 795 (D.C. Cir. 1997).

North Memorial argues that there is not substantial evidence to support the Board's determination that it had a past practice of allowing nonemployee union representatives to use the cafeteria and that it changed that practice on June 23, June 24, and August 21. We will address each argument in turn.

First, we conclude that substantial evidence support's the Board's determination that the hospital had a past practice of allowing nonemployee union representatives to use the cafeteria so long as their conduct did not rise to the level of a "meeting." Nonemployee union representatives from MNA and SEIU testified that for a number of years prior to the summer of 2014 they had regularly visited the cafeteria. Multiple witnesses also testified before the ALJ that the hospital's labor relations representatives were aware of the union's use of the cafeteria. Indeed, Wesman

testified that the hospital had told SEIU that it could use the cafeteria "like anybody else" and could have conversations with off duty union employees there. Moreover, Cahoon and the hospital's counsel, Thomas Trachsel, testified that the hospital had told SEIU that it could gather with off duty employees in the cafeteria if such gatherings included only two or three individuals. The hospital consistently objected to SEIU's conduct in the cafeteria when that conduct rose to the level of a "meeting," however.

We also conclude that substantial evidence supports the Board's determination that the hospital unilaterally changed its past practice when it interfered with the cafeteria access by union representatives on June 23, June 24, and August 21. On June 23, Anthony and Scott were sitting at a table with one off duty employee when Cahoon accused them of violating their access privileges. On June 24, Hamilton and Gulley were sitting at a table with some three to seven union members, but it is unclear whether all of those employees were part of a single group. It is undisputed, however, that Gulley was only talking to one off duty employee when he was confronted by Cahoon. Finally, on August 21, Anderson was talking to one off duty employee when Wesman confronted him. Because the hospital had a past practice of allowing nonemployee union representatives to interact informally with off duty employees in the cafeteria, there is substantial evidence supporting the Board's determination that it changed that practice when it interfered with the union representatives' use of the cafeteria on June 23, June 24, and August 21.

The hospital alternatively argues that even if it did make a unilateral change to a mandatory subject of bargaining, the change was not "material, substantial, and significant." See Peerless Food Prods., 236 N.L.R.B. at 161 (internal quotation marks omitted). In support of its argument, the hospital relies on Peerless Food Products, 236 N.L.R.B. at 161. In that case, the Board determined that an employer had not materially changed its access policies by preventing the union from engaging "unit employees in conversations on the production floor when those conversations [were]

unrelated to contract matters." Id. at 161. The Board determined that the employer's change was not material because it did not significantly reduce the union's access to employees because the union could still visit with employees in their lunch room. Id. In contrast here, the hospital's prohibition of union activity in the cafeteria significantly reduced the unions' contact with employees because without access to the cafeteria the unions were limited to lesser trafficked areas on the lower level of the hospital. We will not deny enforcement on this ground.

The hospital also argues that it gave the union notice and an opportunity to bargain over the change. This argument relies on a June 13 letter to both unions from Cahoon stating that the hospital would turn away picketers on June 24 if it believed their presence would "be disruptive to a calm, healing environment." Because the hospital did not present this argument to the Board, we are barred from considering it under 29 U.S.C. § 160(e). Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665 (1982).

For these reasons, we deny the hospital's petition for review of the Board's determination that it violated Section 8(a)(5) by unilaterally changing its cafeteria access rules on June 23, June 24, and August 21.

B.

The hospital next contests the Board's determination that it violated Section 8(a)(1) of the NLRA by engaging in surveillance of Gulley and Hamilton in the cafeteria on the day of the picket, June 24. The hospital argues that its observation of Gulley and Hamilton was lawful because it claims the right to exclude them from the cafeteria. Because we have concluded that the hospital did not have the right to exclude them from the cafeteria, we deny its petition for review of the Board's determination that the hospital violated Section 8(a)(1) when it engaged in surveillance of Gulley and Hamilton on June 24.

-14-

C.

The hospital finally challenges the Board's determination that it violated the NLRA by prohibiting Richard Geurts, an off duty employee, and Gulley and Hamilton, nonemployee union representatives, from wearing union insignia in the hospital on the day of the picketing. The Board has long recognized that under Section 8(a)(1) "employees have the right to wear union insignia in the workplace." HealthBridge Mgmt., LLC v. NLRB, 798 F.3d 1059, 1067 (D.C. Cir. 2015); see also Wal-Mart Stores, Inc. v. NLRB, 400 F.3d 1093, 1097 (8th Cir. 2005). A ban on employees displaying union insignia in areas of a hospital that are not "immediate patient care areas" is presumptively invalid, absent a showing by the employer of "special circumstances" to support the ban. See HealthBridge, 798 F.3d at 1067–68. In the context of health care, "establishing 'special circumstances' requires evidence that a ban is 'necessary to avoid disruption of health-care operations or disturbance of patients.'" Id. at 1068 (quoting Beth Israel, 437 U.S. at 507).

Substantial evidence supports the Board's determination that the hospital violated the NLRA when it prohibited its employee, Richard Geurts, from wearing union insignia in the hospital's atrium on the day of the picketing. The ban, as applied to Geurts, was presumptively unlawful because Geurts was told to take off his shirt while he was in the facility's atrium. See HealthBridge, 798 F.3d at 1067–68. It was thus the hospital's burden to show that the ban was "necessary to avoid disruption of health-care operations or disturbance of patients." Id. at 1068 (quoting Beth Israel, 437 U.S. at 507). The hospital did not meet this burden with respect to Geurts. The shirt that he wore had MNA insignia on the front and was blank on the back. It did not bear any picketing slogans or criticize the hospital. There is not evidence in the record indicating that an employee wearing such a shirt in a nonpatient care area would necessarily have disrupted health care operations or disturbed patients. We deny the hospital's petition for review of the Board's

-15-

determination that it violated the NLRA by prohibiting Geurts from wearing union insignia in the hospital on June 24.

The hospital also argues that the Board did not correctly apply the law when it determined that the hospital violated the NLRA with respect to Gulley and Hamilton because Section 8(a)(1) union insignia protections only extend to employees. The Supreme Court has stated that "the NLRA confers rights only on employees, not on unions or their nonemployee organizers." Lechmere, 502 U.S. at 532. The Board has not provided any authority, and we cannot find any, indicating that there is an exception to this general rule that extends Section 8(a)(1) union insignia protection to nonemployees. The Board thus incorrectly determined that the hospital violated the NLRA by telling nonemployees Gulley and Hamilton that they were prohibited from wearing union shirts in the facility on June 24. We therefore grant the hospital's petition for review of the Board's determination that it violated the NLRA by prohibiting Gulley and Hamilton from wearing union insignia on June 24.

IV.

We grant the Board's cross application for enforcement of the uncontested provisions of its opinion and its determination that the hospital violated the NLRA by interfering with nonemployee union representatives' access to the public cafeteria in June and August of 2014, engaging in surveillance of Gulley and Hamilton on June 24, and prohibiting Geurts from wearing a shirt displaying union insignia in the facility's atrium on June 24. We also grant the hospital's petition for review and deny enforcement of the order as it relates to its decision to prohibit nonemployees from wearing union insignia in the hospital on June 24.

-16-

BEAM, Circuit Judge, dissenting.

This two-judge court now joins a continuously expanding list of union-employer disputes from this circuit in which the presently structured National Labor Relations Board (NLRB or the Board), generally by means of its cadre of Administrative Law Judges (ALJ), seemingly reconciles facts and construes issues of law most favorably to labor-union interests. See, e.g., NLRB v. Mo. Red Quarries, Inc., 853 F.3d 920, 925 (8th Cir. 2017); Beverly Enters. v. NLRB, 148 F.3d 1042, 1045-46 (8th Cir. 1998); Schnuck Markets, Inc. v. NLRB, 961 F.2d 700, 704 (8th Cir. 1992).

Although it is difficult to discern the breadth of the NLRB's focus in this matter from its and the ALJ's wide-ranging emanations in its thirty-six page Decision and Order, it is unmistakably clear that the gravamen of this particular dispute is and should have been, as a matter of law, limited to the scheduling, preparation for and execution of the union members' June 24 "informational picketing," which exercise dealt with some members' trepidations concerning "staffing levels" at the hospital. The interrelated informational picketing activities mentioned above were in no sense connected with earlier general or episodic use of the hospital's several "open-to-the-public" facilities by the unions' members. Nor did they in any way involve "self organizing" or "collective bargaining" activities as analyzed in Beth Israel Hospital v. NLRB, 437 U.S. 483 (1978). The picket was held at a *public* park adjacent to the hospital.

After an intense prior publicity campaign by the hospital's two unions acting at all times as agents for their members, 500 picketers, including North Memorial employees, fellow union members from the reaches of Minnesota and Wisconsin, and members of the general public gathered on that date in the park for the presentation of the dissident members' views. The Board's Decision and Order attempts to incorporate within the unions' complaint to the Board concerning this matter a broad

-17-

range of union and management interactions occurring at various other earlier times and places. It is clear, however, that these collateral grievances are wholly irrelevant and immaterial to this particular "informational picketing" quarrel with the hospital.[2]

As noted by the court's opinion, the sum total of the actionable facts at issue here were as follows:

> On June 23, the day before the picketing, SEIU representative Frederick Anthony and MNA representative Karlton Scott planned to meet in the cafeteria and then place picket information on bulletin boards throughout the facility. Anthony arrived before Scott, purchased lunch in the cafeteria, and began eating. He had flyers about the picket in a closed folder on his table. When employees approached him to ask questions about the picketing, he gave them a flyer. Anthony did not circulate through the cafeteria or initiate conversations with anyone. When Scott arrived, he sat at Anthony's table and began working on a laptop computer while Anthony finished eating.

> While Anthony and Scott were sitting in the cafeteria, they were approached by the hospital's director of employee and labor relations, Jeffrey Cahoon, and its labor relations representative, George Wesman. Anthony was talking to an off duty employee when Cahoon and Wesman confronted him and Scott. Cahoon accused them of holding a meeting in the cafeteria which Anthony denied. Cahoon replied that he would consider how to respond, but the hospital might file an unfair labor practice charge against them. Anthony and Scott then left the cafeteria and began posting [picketing] information on bulletin boards throughout the facility until hospital officials had them escorted out of

---

[2]The ALJ and NLRB erroneously contend that these earlier interactions, mostly consisting of violations of the existing collective bargaining agreement (CBA) by union employees and members, somehow served to amend the terms and conditions of the earlier agreed upon CBA, making the CBA more favorable to the unions and their members. These contentions are frivolous both as a matter of law and fact.

-18-

the building.  The hospital also gave them written trespass warnings banning them from the facility for one year.

On the same day Melvin Anderson, an employee of the hospital and an SEIU steward, posted information about the picket on a bulletin board in the sterile processing and dispensing department (SPD). Hospital officials then removed the posting and told Anderson he was not allowed to post union information on the SPD bulletin board.

<u>Ante</u> at 4-5.

There is no evidence in the record suggesting that the hospital had a generally applicable policy or practice which [either permitted or] prohibited [union] solicitation or gathering in the cafeteria. Article 1(h) of the collective bargaining agreement (CBA) between North Memorial and SEIU states that SEIU "shall have access . . . to such other nonpatient nonpublic areas to be designated by the Hospital."  The hospital has designated two nonpublic areas for SEIU to meet with employees–a few tables in the lower level of the facility below the atrium and a space off of a hallway near an underground tunnel.  The CBA between North Memorial and MNA does not discuss where MNA may interact with employees, but the hospital has designated a room on its lower level as an MNA office. Neither of the bargaining agreements mention any union right to access public spaces within the facility.

<u>Ante</u> at 3.

Based upon the above facts, the two unions filed charges with the NLRB alleging various violations of the National Labor Relations Act (NLRA or the Act). In turn the NLRB issued a complaint against North Memorial.  This complaint specifically alleges violations of § 8(a)(1) and 8(a)(5) and (1) of the Act.  29 U.S.C. § 158.  Subsection 8(a)(1) incorporates by reference § 7 of the Act, <u>id.</u> § 157. Subsection 8(a)(5) incorporates by reference § 9(a) of the Act, <u>id.</u> § 159.  The

complaint also alleges violations of § 8(a)(3) and (1) of the Act.  Subsection 8(a)(3) incorporates by reference § 9(a) and (e) of the Act.[3]

---

[3]The applicable sections of the NLRA are:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157.

**(a)  Unfair labor practices by employer**

It shall be an unfair labor practice for an employer–

> (1)    to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

> . . . .

> (3)    by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided*, That nothing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this subsection as an unfair labor practice) to require as a condition of employment membership

-20-

therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later, (i) if such labor organization is the representative of the employees as provided in section 159(a) of this title, in the appropriate collective-bargaining unit covered by such agreement when made, and (ii) unless following an election held as provided in section 159(e) of this title within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement: *Provided further*, That no employer shall justify any discrimination against an employee for nonmembership in a labor organization (A) if he has reasonable grounds for believing that such membership was not available to the employee on the same terms and conditions generally applicable to other members, or (B) if he has reasonable grounds for believing that membership was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership;

. . . .

(5)  to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

## (b)  Unfair labor practices by labor organization

It shall be an unfair labor practice for a labor organization or its agents–

. . . .

      (5)    to require of employees covered by an agreement authorized under subsection (a)(3) of this section the payment, as a condition precedent to becoming a member of such organization, of a fee in an amount which the Board finds excessive or discriminatory under all the circumstances. In making such a finding, the Board shall consider, among other relevant factors, the practices and customs of labor organizations in the particular industry, and the wages currently paid to the employees affected;

. . . .

29 U.S.C. § 158.

**(a)   Exclusive representatives; employees' adjustment of grievances directly with employer**

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided*, That any individual employee or a group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a collective-bargaining contract or agreement then in effect: *Provided further*, That the bargaining representative has been given opportunity to be present at such adjustment.

. . . .

Notwithstanding the Board's complaint against North Memorial, the relevant facts as outlined by the court and established by the record support absolutely no violations of the NLRA. Indeed, the Act does not seek to in any way regulate "informational picketing" on public property as occurred in this matter.

Although the ALJ and the Board accuse North Memorial of committing "unfair labor practices" in violation of 29 U.S.C. 157, neither that section (nor any other section of the Act to my knowledge) cites or explains the words "informational picketing on public property" unrelated to the right to collectively bargain or organize. See id. § 158(c)(7)(C).

Informational picketing on public property, as here, is expressive conduct within the protection of the First Amendment. Phelps-Roper v. City of Manchester, Mo., 697 F.3d 678, 686 (8th Cir. 2012). And, the communications at issue as earlier publicized, prepared for and discussed at the park in no way involved "self-

---

**(e)    Secret ballot; limitation of elections**

(1)    Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158(a)(3) of this title, of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

. . . .

29 U.S.C. § 159.

-23-

organizational" privileges or "collective bargaining" rights or activities as discussed in Beth Israel. The hospital's union members had long ago self-organized and collectively bargained for an agreement that has long been and is now fully in place. There is no record that either of these matters were in any way discussed or debated on the public property or elsewhere.

I digress briefly to note that the unions' and their members' communicative activity on hospital-owned private property presents a starkly different scenario. And, to be clear, every action for which the NLRB purports to penalize the hospital, occurred only on private property.

I find no statutory authorization or binding judicial precedent that transfers to the NLRB any adjudicative authority over the hospital's communicative activity concerning these matters protected by the First Amendment. Without such authorization or precedent, the NLRB has no jurisdiction over this member-employer dispute concerning use of the hospital's private property with regard to an informational picket.

Recently, the Supreme Court in Henson v. Santander Consumer USA Inc., No. 16-349, slip op. at 9 (June 12, 2017), buttressed this conclusion. The Court's opinion, albeit in a slightly different context, notes that a court's job (and I presume also an administrative agency with adjudicatory authority) is to "apply faithfully the law Congress has written" and not attempt to "replace the actual text with speculation as to Congress' intent" as appears to be the course of action by the Board in its vastly overreaching cease and desist conclusions in this matter. Id. (second passage quoting Magwood v. Patterson, 561 U.S. 320, 334 (2010)).

While I concede that the hospital, through collective bargaining under the auspices of the NLRA, could have contractually agreed to a more generous use of the hospital's private property, it did not do so. As earlier noted, the collective bargaining

-24-

agreement clearly designated only two nonpublic areas for the SEIU to meet employees–a few tables in the lower level of the facility below the atrium and a space off a hallway near a ground tunnel–and a room on its lower level for use as an MNA office. As also earlier noted, neither bargaining agreement mentions any right for either union to access any "open-to-the-public" space within the facility to conduct union business.

In this case, the unions and the Board adopt the unsupportable stance that all of the hospital's "open-to-the public" facilities are substantially available for the unions' person-to-person interaction and communication with their membership. Indeed, in its Decision and Order, the Board demands that North Memorial shall "cease and desist" from limiting any measure of the unions' use and activity on such property, thus giving the unions unfettered use of hospital facilities that are in any way "open to the general public" or designated as "public areas," or referenced as for public use. Indeed, the Decision and Order repeats these broad ranging cease and desist prohibitions in various ways multiple times. Thus, the Decision and Order's "public area" references would include, in addition to the hospital's cafeteria, any publicly available family visiting or waiting rooms, publicly accessible gift shops, snack bars or vending areas, publicly accessible toilet facilities, public stairways, public lobbies of any description or location, bulletin boards visible to public viewing and, perhaps, the hospital's parking lots.

I concede that in Beth Israel, the Supreme Court substantially opened lines of use and communication in nonworking hospital areas when the activity is strictly dedicated to "the right of employees to self-organize and bargain collectively." 437 U.S. at 491. But, in doing so, the Court also determined that the NLRB must adjust "the undisputed right of self-organization assured to employees under [Section 7 of the NLRA] and the equally undisputed right of employers to maintain discipline in their establishments." Id. at 492 (quoting Republic Aviation Corp. v. NLRB, 324 U.S. 793, 797-98 (1945)). Accordingly, the almost unlimited breadth and depth of

-25-

the Board's order in this case arising *only* from an informational, First Amendment-authorized picketing dispute is unprecedented and erroneous.

At the bottom line, this case is controlled by this circuit's holdings in <u>Baptist Medical System v. NLRB</u>, 876 F.2d 661 (8th Cir. 1989). Therein, the court, recognizing only the "self-organization" rights enumerated in <u>NLRB v. Babcock & Wilcox Co.</u>, 351 U.S. 105, 113 (1956), and the "collective bargaining" prerogatives outlined in <u>Beth Israel</u>, states "[b]y inviting the public to use an area of its property, the employer does not surrender its right to control the uses to which that area is put." <u>Baptist Med.</u>, 876 F.3d at 664.

Based upon the above-stated precedent, these seriously overreaching edicts by the NLRB on behalf of self-aggrandizing labor unions indelibly portray biased and mistaken decisions. In sum, the Board has turned established precedent on its head. Without the benefit of a collectively bargained agreement providing this incredible access, the Board's orders are simply unenforceable.

The Board's Decision and Order should be reversed and the unions' complaints dismissed.

Accordingly, I dissent.

_____